IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| AURORA COOPERATIVE ELEVATOR COMPANY,<br><br>        Plaintiff,<br><br>vs.<br><br>AVENTINE RENEWABLE ENERGY HOLDINGS, INC., *et al*.<br><br>        Defendants. | 4:12-CV-3200<br><br>MEMORANDUM AND ORDER |

     This matter is before the Court on the defendants' Emergency Motion to Enforce Stay and for Temporary Restraining Order and Preliminary Injunction.[1] Filing 34. For the reasons discussed below, the defendants' motion will be denied.

BACKGROUND

     Aurora Cooperative (Aurora Co-op) is a Nebraska corporation located in Aurora, Nebraska. Filing 1 at ¶ 1. Aventine Renewable Energy Holdings and Aventine Renewable Energy are foreign corporations, registered to do business in Nebraska, and Aventine Renewable Energy – Aurora West is a limited liability company whose sole member is Aventine Holdings (collectively, "Aventine"). Filing 1 at ¶¶ 2–4; filing 20 at ¶¶ 2–4, 60–62.

     Around 2006, Aurora Co-op acquired an agri-business complex on an industrial site just west of Aurora (the "Aurora West site"). Filing 39-21 at ¶ 4. The site is bounded to the north by U.S. Highway 34, and to the south by a Burlington Northern Santa Fe (BNSF) railroad line. Filing 39-21 at ¶ 4; filing 39-24 at 3. In June 2006, Aurora Co-op sold Aventine a large portion of the land within the site. Filing 20-1. And in August 2006, Aventine and Aurora Co-op entered into a series of agreements related to the development of an ethanol plant on the land Aventine had purchased. Filing 1 at ¶¶ 8–9; filing

---

[1] While captioned as a request for a TRO and preliminary injunction, Aventine's request is, at this point, only a request for a preliminary injunction. *See Williams v. Federal Home Loan Mortg. Corp.*, 2013 WL 6713278, at *8 (D. Md. Dec. 18, 2013) ("A preliminary injunction is distinguished from a TRO only by the difference in notice to the nonmoving party and by the duration of the injunction.").

39-1; filing 39-21 at ¶ 6. The parties' agreements provided for the development of roads, rail tracks, and other infrastructure needed to operate the plant, and envisioned that Aventine would operate the plant using grain provided by Aurora Co-op. Filing 1 at ¶ 8; filing 39-1 at 1–12; filing 39-2; filing 39-21 at ¶¶ 5–8. Aventine constructed the plant, and Aurora Co-op built a grain elevator and grain storage facility. Filing 39-1 at 1–11; filing 39-21 at ¶¶ 5, 16.

The present dispute centers around a pair of railway tracks that surround the Aurora West site and Aventine's ethanol plant—the "Double Track Loop." The Loop is shaped roughly like an athletic track and consists of two sets of railway tracks (the "Interior and Exterior Loops"). Filing 39-21 at ¶ 11; filing 39-5; filing 39-18; filing 39-22 at ¶ 6; filing 39-24 at 1–3. The Inner and Exterior Loops are (with exceptions not relevant here) situated on land owned by Aventine and Aurora Co-op, respectively. A service road runs between the two tracks, and the line dividing the parties' property runs down the middle of the road. Filing 39-21 at ¶ 11; filing 39-24 at ¶¶ 5–8 & p. 3.

On the southern border of the Aurora West site, the Double Track Loop runs parallel to the BNSF line. A set of crossover tracks and switches connect the Exterior Loop to the BNSF line, and another set of tracks and switches connect the Exterior and Interior Loops. Filing 39-21 at ¶¶ 11, 13; filings 39-5, 39-6, and 39-7; filing 39-18; filing 39-24 at 3. In order to move from the BNSF line to the Interior Loop (or vice versa), a railcar must pass over one set of crossover tracks, then travel along the Exterior Loop for a short distance (approximately 100 feet),[2] then pass over another set of crossover tracks. The Court will refer to the small portion of the Exterior Loop that lies between the crossover tracks as the "Switching Portion."

Among the agreements signed by Aventine and Aurora Co-op in August 2006, two are particularly important to the present dispute. The first is the Double Track Loop Easement and Use Agreement (the "Double Loop Agreement") and the Grain Supply Agreement. Filing 39-3. Under this agreement, Aventine and Aurora Co-op granted each other easements over certain parcels of real estate owned by the other party and over the portion of the Double Track Loop located on that real estate. Filing 39-3 at 2, 6–7. The second is the Grain Supply Agreement. Filings 39-2. It is essentially a requirements contract, whereby Aventine agreed to purchase from Aurora Co-op, on an exclusive basis, "all of the [g]rain which Aventine requires to operate the Aventine Ethanol Plant." Filing 39-2 at 2. The agreement allows the Co-op to furnish the grain from its own farmer members or to procure it

---

[2] This is an estimation based upon the materials currently in the record. *See*, filings 39-5, 39-6, and 39-7; filing 39-24 at 3. The exact length is not important at this time.

- 2 -

from third parties. Filing 39-2 at 5–8. Each grain purchase was to give rise to and be governed by a separate "Grain Contract." Any dispute arising under a Grain Contract is subject to arbitration through the National Grain and Feed Association. Filing 39-2 at 2. Both the Double Loop and Grain Supply Agreements are governed by Nebraska law. Filing 39-2 at 14; Filing 39-3 at 14–15.

In the summer of 2012, a dispute arose regarding one or more Grain Contracts. Aurora Co-op alleges that in July and August 2012, Aventine failed to pay for approximately $1,800,000 in grain that Aurora Co-op had procured, in violation of the Grain Supply Agreement and the underlying Grain Contracts. Filing 1 at ¶¶ 29–44; filing 39-21 at ¶ 19. On September 17, 2012, Aurora Co-op initiated an arbitration proceeding with the National Grain Feed Association, seeking to recover these payments. Filing 39-21 at ¶ 20.

Aventine contends that it was Aurora Co-op that breached the Grain Supply Agreement (as well as another contract not at issue here), by failing to make certain payments. Filing 20 at ¶¶ 69–76; filing 39-10. On September 18, 2012, Aurora Co-op received a letter from Aventine's CEO, stating that as a result of Aurora Co-op's failure to make these payments, Aventine had terminated the Grain Supply Agreement. Filing 39-10.

Aurora Co-op responded by filing the present suit. Aurora Co-op seeks, among other things, a declaration that Aventine's purported termination of the Grain Supply Agreement was not effective, that the agreement remains in effect, and that Aventine, not Aurora Co-op, has breached the agreement. Filing 1 at 14–16. Aventine counterclaimed, seeking a declaration to the opposite effect: that Aurora Co-op had breached the Grain Supply Agreement, which Aventine then lawfully terminated. Filing 20 at 13–14. After these initial filings, the case was informally stayed to allow the parties to arbitrate their disputes under the Grain Contracts. *See*, filings 26, 27, 28, 29, and 30.

Much like the docket in this case, Aventine's ethanol plant has remained more or less idle since running briefly in the summer of 2012. Filing 34-10 at ¶ 11. Aventine's president, Mark Beemer, explained that due to the relative prices of grain and ethanol over this period, Aventine could only have operated the plant at a loss.[3] Filing 34-10 at ¶ 11. However, in the fall of 2013, Aventine learned that it could acquire sugar at a favorable price from the U.S. Department of Agriculture. Aventine projected that, using

---

[3] Aurora Co-op has objected to several paragraphs of Beemer's declaration on foundation and hearsay grounds. Aurora Co-op's objections are overruled as moot—even if the entirety of Beemer's declaration is considered, Aventine is not entitled to injunctive relief at this time.

- 3 -

sugar rather than grain, it could finally produce ethanol at a profit. Filing 34-10 at ¶ 12. So, Aventine contracted with the Department of Agriculture to purchase "enough sugar to operate at full capacity for several months." Filing 34-10 at ¶ 13. The sugar was to be delivered by rail, with the first shipment scheduled to arrive in mid-February 2014. Filing 34-10 at ¶ 16.

In January 2014, Aurora Co-op learned of Aventine's plan to produce ethanol using sugar. Filing 39-21 at ¶ 25. In a letter dated January 28, 2014, counsel for Aurora Co-op wrote to Aventine to address what Aurora Co-op regarded as Aventine's "inconsistent positions" regarding the Grain Supply and Double Loop Agreements. Filing 39-12. Aurora Co-op maintained that pursuant to the Double Loop Agreement, the easements that it granted were terminated immediately (along with the Double Loop Agreement itself) in the event that either party terminated the Grain Supply Agreement. And, Aurora Co-op asserted, without these easements, Aventine had no right to access the Switching Portion of the Exterior Loop, which Aventine would need to use to ship railcars between the BNSF line and the Interior Loop. Filing 39-12.

The portion of the Double Loop Agreement that Aurora Co-op relied upon provides, in part:

> The initial term of this Agreement and the easements granted herein shall commence on August 1, 2006 . . . and shall continue thereafter for a term of twenty (20) years . . ., except as is expressly provided below. . . . Anything herein to the contrary notwithstanding, this Agreement shall terminate as follows:
>
> . . . .
>
> (B) Immediately in the event the then current Grain Supply Agreement between Aurora Co-op and Aventine expires or is terminated by either party.

Filing 39-3 at 4.

Thus, Aurora Co-op took the position that Aventine could not simultaneously claim that it had terminated the Grain Supply Agreement in September 2012 and continue to claim access to the easements granted by the Double Loop Agreement. Alternatively, Aurora Co-op asserted that Aventine's attempt to terminate the Grain Supply Agreement, while not effective, did amount to an anticipatory repudiation of that agreement. And, Aurora Co-op further argued, the Grain Supply and Double Loop Agreements were inextricably linked, such that a repudiation of one excused performance under the other. Thus, Aurora Co-op asserted that it was entitled to suspend

- 4 -

performance under the Double Loop Agreement, such that it no longer had any obligation to allow Aventine on its land. Aurora Co-op concluded the letter by stating it would take legal action to prevent Aventine from using any portion of the Exterior Loop, unless Aventine (1) retracted its purported termination of the Grain Supply Agreement, and (2) stipulated to dismissal with prejudice of its counterclaims in the present case which allege that the agreement has been terminated. Filing 39-12.

Aventine disagreed with Aurora Co-op's legal analysis, and on February 4, 2014, Aventine used the Switching Portion to move two railcars from the BNSF line to the Interior Loop. Filing 39-13; filing 39-21 at ¶ 28. That same day, Aurora Co-op filed a separate suit with this Court, essentially seeking a declaration that its position above was correct and enjoining Aventine from using the Exterior Loop unless Aventine retracted its position that the Grain Supply Agreement had been terminated. Case no. 4:14-CV-3032, filing 1 at 14–16.

However, that was not all Aurora Co-op did. On February 14, 2014, Aurora Co-op locked the switches at the Exterior Track Loop, effectively barring rail traffic from crossing between the BNSF line and the Interior Loop. Filing 39-21 at ¶ 30. Aurora Co-op then sent a final letter to Aventine, stating that it would remove the locks if Aventine provided written assurance that it would comply with the Grain Supply Agreement for the duration of this case. However, Aurora Co-op dropped its demand that Aventine also dismiss its counterclaim alleging the agreement had been terminated. Filing 39-16 at 3. In response, Aventine filed the pending motion for preliminary injunctive relief. Filing 34.

## ANALYSIS

Aventine asks the Court to enter a preliminary injunction ordering Aurora Co-op to remove the locks and prohibiting Aurora Co-op from interfering with Aventine's use of the portion of the Exterior Loop it needs to conduct its business. Aventine also argues that the present case was stayed pending arbitration, and that Aurora Co-op's actions—filing a separate declaratory suit and locking the tracks—violate that stay. This argument is quickly dealt with, and so the Court turns to it first.

### THE STAY PENDING ARBITRATION

Contrary to Aventine's assertion, no order has been entered staying this case.[4] Even if there were such an order, Aventine has not explained how

---

[4] No motion to stay has been filed, and the Magistrate Judge's order that Aventine references did not order a stay. Filing 27. That order simply observes that litigation had

Aurora Co-op's acts—locking the tracks and filing a separate declaratory action—are in any way interfering with the arbitration proceeding. First, a stay is not an injunction, and it would not affect Aurora Co-op's out-of-court actions. Second, Aventine's separate suit does not ask the Court to construe or interpret the Grain Supply Agreement. In any event, at the hearing on the present motion, counsel for Aventine conceded that whether the Grain Supply Agreement was terminated is not an issue pending in arbitration. So, the Court does not understand how Aurora Co-op's separate suit will interfere with the pending arbitration. And even if it did, the matter is better addressed in that suit.

PRELIMINARY INJUNCTION

When deciding whether to issue a preliminary injunction, the Court weighs the four *Dataphase* factors: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1098 (8th Cir. 2013); (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). A preliminary injunction is an extraordinary remedy, and the movant bears the burden of establishing its propriety. *Roudachevski v. All-American Care Centers, Inc.*, 648 F.3d 701, 705 (8th Cir. 2011); *see also H&R Block Tax Servs. LLC v. Acevedo-Lopez*, No. 13-1387, 2014 WL 539788, at *2 (8th Cir. Feb. 12, 2014).

The Court finds that, on the current record, Aventine has not demonstrated that it will be irreparably harmed in the absence of preliminary injunctive relief. Moreover, while there remain some factual and legal issues warranting further development, Aventine has not shown a sufficient likelihood of success on the merits. The Court understands that Aventine is frustrated by Aurora Co-op's self-help measures. Even if these actions are not (at this time) legally prohibited, they are easily characterized as purely retributive. And if this conduct continues, it is not unreasonable to expect that Aventine will find a way to seek further relief.

That said, while the economic harm Aventine faces is obvious, it is not irreparable. And a showing of irreparable harm is the fundamental prerequisite to injunctive relief—absent that, even if Aventine had presented "a strong claim on the merits," injunctive relief would be improper. *Roudachevski*, 648 F.3d at 706. The remaining factors support Aventine's

---

been "stayed" (by the parties) pending arbitration, and directed them to provide status updates. *See also*, filing 26; filing 39-23 at ¶ 2.

position. As the Court has already suggested, the balance of equities favors Aventine's position, and the balance of harms is likewise in Aventine's favor. It is also clear that the public interest would be served by ending the economic standstill imposed by Aurora Co-op and allowing Aventine to put its ethanol plant to productive use. But without a showing of irreparable harm, these factors will not support injunctive relief.

### I. Irreparable Harm

To show a threat of irreparable harm, the movant must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief. *Roudachevski,* 648 F.3d at 706. Stated differently, the harm "must be actual and not theoretical." *Brady v. Nat'l Football League,* 640 F.3d 785, 794 (8th Cir. 2011).

Aventine needs rail access to produce ethanol at a profit. Aventine can use roads to bring in employees, tools, and some supplies, but its plant was designed to receive feedstock and ship finished ethanol by train. Using trucks to do this would be cost-prohibitive and impractical. Filing 34-10 at ¶ 19. While this presents a very real harm to Aventine's bottom line, it is not irreparable. The potential profits that Aventine has lost and the costs it has already incurred are economic harms that can be remedied with money damages. And harm is not irreparable when a party can be fully compensated for its injuries through an award of damages. *Gen. Motors Corp. v. Harry Brown's, LLC,* 563 F.3d 312, 319 (8th Cir. 2009).

Potential economic loss will constitute irreparable harm where the loss is so great that it threatens the very existence of a business. *Packard Elevator v. Interstate Commerce Comm'n,* 782 F.2d 112, 115 (8th Cir. 1986). Aventine, citing this proposition, argues that forcing it to "completely cease its operations during the pendency of litigation" likewise qualifies as irreparable harm. Filing 34-1 at 19. But the only evidence Aventine offers in support of this claim are two sentences from Beemer, who averred that "[t]he cost to Aventine from being closed out of access to its sources of supply and its sales market, and the ripple effect to the broader community, absent the intervention of the Court, are incalculable. The Aventine ethanol plant would be crippled without rail access." Filing 34-10 at ¶ 21. These conclusory statements are not enough to show irreparable harm.

First, showing that the plant is "crippled," i.e., that it cannot operate efficiently without rail access, does not by itself demonstrate an existential threat to Aventine's business. The plant has remained essentially idle since July 2012. Filing 34-10 at ¶ 11. Aventine has not explained (much less shown) how remaining idle while this case proceeds will result in irreparable harm. Second, even if Beemer had actually stated that the plant would close

or go out of business, the Court lacks the information it needs to assess such a declaration. Aventine has not shown, for example, how much it has spent on sugar already, and how much it still owes the Department of Agriculture. The Court would also need to know whether Aventine could mitigate these losses in any way, perhaps by using the sugar in another of Aventine's plants or reselling it to another company.[5] Most importantly, Aventine has not offered any concrete evidence of the impact these losses will have on its overall financial viability.

The economic harm that Aventine faces, while not quantified, is real and obvious. But Aventine must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). At this time, the Court lacks any facts with which to evaluate the nature, scope, and imminence of that harm. When weighing the possibility of irreparable harm, courts may in some cases accept mere arguments from "general business principles." *General Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319–20 (8th Cir. 2009). But the Court may also insist upon more substantive evidence. *Id.* On the current record, Aventine has given the Court no reason to believe the harm it faces is anything but a provable economic loss.[6]

But there is an even more basic problem with Aventine's attempt to demonstrate irreparable harm. Aurora Co-op has stated that it will remove the locks and restore Aventine's rail access if Aventine agrees, for the duration of this case, to abide by the Grain Supply Agreement. Filing 39-16 at 3. Although Aurora Co-op originally insisted that Aventine also dismiss its counterclaim alleging that the Grain Supply Agreement has been terminated, Aurora Co-op has since dropped that demand. Filing 39-16 at 3.

Aventine has not explained how agreeing to be bound by the Grain Supply Agreement for the duration of this trial will cause it any, let alone irreparable, harm. The Grain Supply Agreement is a requirements contract— Aventine is obligated to purchase all of the grain it needs to operate the

---

[5] Aventine owns other ethanol plants in Illinois and Indiana. *See* filing 39-21 at ¶ 23.

[6] Beemer also stated that the harm to Aventine would be "incalculable." Filing 34-10 at 21. While this choice of words was likely a rhetorical flair, it at least implicitly raises another argument, not addressed in Aventine's brief, but which is worth a brief mention. Irreparable harm will be found where the nature of the loss makes monetary damages very difficult to calculate. *See, e.g.*, *East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 705 (7th Cir. 2005); *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995). However, this conclusory statement no more provides satisfactory support for this argument than the argument discussed above. Aventine has not given the Court any reason to believe it will face undue difficulty quantifying any losses at trial.

ethanol facility from Aurora Co-op. But as with such contracts generally, nothing in that agreement obligated Aventine to purchase any particular amount of grain, or any grain at all. Instead, Aventine was obligated to purchase "such actual . . . requirements as may occur in good faith." Neb. U.C.C. § 2-306(1). So long as Aventine decides in good faith that it does not need any grain, there is no requirement that it buy any. *See Brisbin v. Superior Valve Co.*, 398 F.3d 279, 291 (3d Cir. 2005); *see also*, Neb. U.C.C. § 2-306 & cmt. 2; *Meyer v. Sandhills Beef, Inc.*, 318 N.W.2d 863, 865–66 (Neb. 1982). Aurora Co-op has not suggested that Aventine's business judgment— that it could not profitably produce ethanol using grain—was not made in good faith. Nor does the Grain Supply Agreement require Aventine to operate its plant using *only* grain. Aurora Co-op agrees that sugar is not a "grain" for purposes of the agreement. So, provided it has a good faith basis for purchasing sugar, as opposed to grain provided by Aurora Co-op, the Grain Supply Agreement poses no obstacle to Aventine's plans to use sugar.

It may be that Aventine does not wish to risk exposing itself to attack by Aurora Co-op on the grounds that the decision to purchase sugar (or to simply not purchase *any* feedstock) was not made in good faith. *See, e.g.*, *Brisbin*, 398 F.3d at 291. But it is Aventine's burden to show that it is facing irreparable harm, and Aventine has not yet done so.

## II. Likelihood of Success on the Merits

A party seeking injunctive relief need not necessarily show a greater than fifty percent likelihood that it will prevail on the merits. *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 731 (8th Cir. 2008). When the balance of the remaining factors tips decidedly in the movant's favor, an injunction may issue if the movant "has raised questions so serious and difficult as to call for more deliberate investigation," *id.*, or shown that the issues raised provide a "fair ground for litigation." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). It follows that where the balance of equities is closer, the movant must show a greater possibility of success. *Dataphase*, 640 F.2d at 113. Because Aventine has not shown irreparable harm, an injunction is not warranted, no matter how likely Aventine is to succeed at trial. The Court nonetheless considers the parties' arguments on the merits.[7]

The present dispute centers around the easements granted by the Double Loop Agreement, and even more specifically, on the contractual

---

[7] Doing so may help the parties and the Court focus on the issues that deserve the most attention. And under Fed. R. Civ. P. 52(a)(2), the Court must state the findings and conclusions that underlie its decision. *See H&R Block Tax Servs.*, 2014 WL 539788, at *2.

- 9 -

provision quoted (in part) above. Briefly stated, Aventine argues that a correct reading of the Double Loop Agreement shows that the easements it grants should survive even if the agreement itself is terminated. So, regardless of what has happened to the Grain Supply Agreement, Aventine argues that it has retained the right to use those portions of the Exterior Loop necessary to conduct its business.

Aurora Co-op counters that the Double Loop Agreement and the easements must survive or fall as one. Aurora Co-op also asserts that the Grain Supply Agreement and Double Loop Agreement are inextricably intertwined. Thus, Aurora Co-op argues, even though Aventine's purported termination of the Grain Supply Agreement was not effective, it did constitute an anticipatory repudiation of that agreement, which, in turn, entitled Aurora Co-op to suspend performance under the Double Loop Agreement.

As the parties have framed the issues, in order to determine Aventine's probability of success on the merits, the Court need not (and has not been asked to) determine whether the Grain Supply Agreement was terminated. If it was terminated, Aventine must show that the easements granted within the Double Loop Agreement nonetheless survived. Or, more accurately, Aventine must demonstrate that this question presents a "fair ground for litigation." *Watkins*, 346 F.3d at 844. If the termination was not effective, the Court must determine whether Aurora Co-op is likely correct that it was nonetheless entitled to suspend performance under the Double Loop Agreement.[8]

Before turning to the parties' contractual arguments, the Court must examine a more basic issue. Aventine argues that it is not clear "what, if any, ownership interest each party has in any particular portion of the double track loop arrangement." Filing 34-1 at 5. Instead, Aventine contends that the parties "merely granted one another easements 'upon their respective Sites and the portion of the Double Track Loop located thereon to the extent [. . .] necessary to permit' their use of such track." Filing 34-1 at 5 (quoting the Double Loop Agreement, filing 39-3 at 2)). And, Aventine asserts, "there has been no 'as-built' survey that definitively locates the

---

[8] The Court need not determine, for purposes of applying the *Dataphase* factors, whether Aurora Co-op bears the burden of proving this argument is likely to succeed, or whether Aventine must show it is likely to fail. Cf. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007). Aventine has not demonstrated irreparable harm, and so an injunction is not warranted, regardless of the probability of success on the merits.

- 10 -

double track loop arrangement on each entity's land.'"[9] Filing 34-1 at 6; filing 34-10 at ¶ 9.

To the extent that Aventine is claiming that it is not clear who owns the land beneath the Interior and Exterior Loops, its argument is not supported by the record. Aurora Co-op has submitted the affidavit of Jai Jason Andrist, a registered land surveyor who participated in the preparation of the plat for the original Aurora West site in 2006 and 2007. In 2011, Andrist directed and supervised a survey of the site, which Aurora Co-op has also provided. Filing 39-24 at ¶¶ 1–3 & pp. 3–4. Andrist averred that (with exceptions not relevant here), the Inner and Exterior Loops lie on land owned entirely by Aventine and Aurora Co-op, respectively. Filing 39-24 at ¶¶ 4–8. This is reflected in the survey. Filing 39-24 at 3. The record therefore shows that Aurora Co-op owns all of the land beneath the Switching Portion.

The line dividing the parties' properties runs between the tracks, and from the survey, it appears to run roughly equidistant from each track, which would place it in the center of the service road. Filing 39-24 at ¶ 7 & p. 3; filing 39-21 at ¶ 11. So, it follows that Aurora Co-op also owns the land underneath the crossover tracks, from the point they leave BNSF property until they reach the center line of the service road, with the remainder of the crossover tracks located on Aventine's property.

Aventine has not offered any evidence to contradict these findings. Instead, Aventine focuses on the fact that there has been no "as-built" survey that shows the location of the crossover tracks. It is true that the 2011 survey does not depict the crossover tracks. But the photographs submitted by Aurora Co-op do show the crossover tracks. Filings 39-5, 39-6, and 39-7. And the location of the crossover tracks relative to the parties' property lines is readily apparent. Nor is there is any suggestion that the property lines have changed since the 2011 survey. The only thing that is not clear is the location of the switches (that is, the mechanisms which control the operation of the crossover tracks). But that alone does not show that Aventine has any claim to enter Aurora Co-op's land.

Aventine also argues that it is not clear who owns the relevant portions of the tracks themselves. The parties agreed that Aventine would bear the cost of constructing the Interior Loop and Aurora Co-op the cost of the Exterior Loop. Filing 39-1 at 7. They split the cost of siting, permitting, and designing all of the rail projects. Filing 39-1 at 6–7. And they split the cost of constructing the gravel service road and all of the crossover tracks and

---

[9] Along those lines, Aventine also asks that the Court order Aurora Co-op to allow Aventine onto its property to conduct a survey. Although Aventine's motion for an injunction will be denied, Aventine is free to reassert its survey request as a matter for discovery.

switches—both the tracks from the BNSF line to the Exterior Loop and the tracks from the Exterior Loop to the Interior Loop. Filing 39-1 at 7. The parties also agreed to split any continuing expenses related to the crossover tracks and switches (such as repairs and payments to BNSF). Filing 39-3 at 3. Aventine asserts that this joint contribution gave rise "to at least a fifty percent ownership interest" in the crossover tracks and switches. Filing 34-1 at 15. But Aventine has not offered any argument to flesh out this conclusion, nor cited any law in support. Even if Aventine has such an ownership interest, there remains an analytical leap between an interest in the tracks themselves and the right to run trains over those portions of the tracks resting upon Aurora Co-op's realty.

As it stands, then, Aventine must show that the easements remain viable in order to show a likelihood of success on the merits. Aventine's joint ownership arguments may warrant further development, but have not been convincingly articulated at this time. So, the Court turns to the focus of the parties' submissions: the Double Loop Agreement.

The meaning of a contract, and whether a contract is ambiguous, are questions of law. *Big River Const. Co. v. L & H Properties, Inc.*, 681 N.W.2d 751, 756 (Neb. 2004). When the terms of a contract are clear, a court may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning as the ordinary or reasonable person would understand them. *Id.* A contract must be construed as a whole, and, if possible, effect must be given to every part thereof. *Id.*

As noted above, this case centers upon one portion of the Double Loop Agreement, namely, section 8, which provides for the term of the agreement. That section provides as follows:

> The initial term of this Agreement <u>and the easements granted herein</u> shall commence on August 1, 2006 . . . and shall continue thereafter for a term of twenty (20) years after . . ., except as is expressly provided below or unless earlier terminated as hereinafter provided in Section 18 below. Provided this Agreement has not been sooner terminated, and provided further that Aventine shall have entered into a binding Grain Supply Agreement with Aurora Co-op pursuant to which Aventine has agreed to purchase all of the grain required by Aventine to operate Aventine's Ethanol Facility, as defined in the Master Development Agreement for and during the entire term of any such extension, Aventine shall have the right to extend this Agreement <u>and the easements granted herein</u> for five (5) additional periods of five (5) years each . . . . Anything herein to

the contrary notwithstanding, <u>this Agreement</u> shall terminate as follows:

    (A) At completion of the closing, in the event Aurora Co-op purchases the Aventine Site; or

    (B) Immediately in the event the then current Grain Supply Agreement between Aurora Co-op and Aventine expires or is terminated by either party.

Filing 39-3 at 4 (emphasis supplied).

Both parties agree that, in the event the Grain Supply Agreement is terminated, the Double Loop Agreement will likewise cease to operate. But Aventine, focusing on the differences in the underlined language above, argues that even if the Double Loop Agreement is terminated in this fashion, the easements that it creates will continue to exist. Citing the maxim "*expressio unius est exclusio alterius*" (the expression of one thing is the exclusion of the others), Aventine argues that while the agreement contemplates that both the Double Loop Agreement and the easements may be *extended*, only the agreement terminates with the Grain Supply Agreement. In other words, Aventine argues that the lack of the phrase "and the easements granted herein" in the final sentence means that the easements continue independent of the Double Loop Agreement. Filing 39-3 at 4.

The Court is not persuaded. Or, more precisely, the Court's preliminary determination is that Aurora Co-op has advanced the more reasonable interpretation of this provision. The Court further finds that, despite the parties' conflicting interpretations, this provision is not ambiguous. The fact that parties to a document have or suggest opposing interpretations of the document does not necessarily, or by itself, compel the conclusion that the document is ambiguous. *Big River Const.*, 681 N.W.2d at 756. A provision of a contract is ambiguous when, considered with other pertinent provisions as a whole, it is susceptible of at least two *reasonable* but conflicting interpretations. *Krzycki v. Genoa Nat. Bank,* 496 N.W.2d 916, 921 (Neb. 1993); *Bedrosky v. Hiner,* 430 N.W.2d 535, 539 (Neb. 1988). As the Court explains below, the interpretation that Aventine currently advances is not reasonable.[10]

---

[10] The meaning of a contract and whether it is ambiguous are, as noted above, questions of law. *Big River Const.*, 681 N.W.2d at 756. In that sense, the Court's finding is not likely to change. However, it is important to note that this determination is still a preliminary one.

When section 8 is considered in its entirety and with the agreement as a whole, it is apparent that the easements only survive as long as the agreement which created them. First, Aventine's reading ignores the beginning of section 8, which synchronizes the beginning *and* the end of the agreement and the easements: "[t]he initial term of this Agreement and the easements granted herein shall commence on August 1, 2006 . . . and shall continue thereafter for a term of twenty (20) years . . ., except as is expressly provided below." Filing 39-3 at 4. The "below" referred to is the final sentence and the two termination triggers: purchase of the Aventine site by Aurora Co-op or termination of the Grain Supply Agreement. The first sentence sets forth an identical time table for the agreement and the easements it creates. Having already established that, there was no need to separately refer to the easements in the final sentence.

There was no need to separately refer to the easements because there is no basis in the Double Loop Agreement (or any of the parties' other agreements) by which these easements could exist independent of the Double Loop Agreement. The easements were granted pursuant and subject to that agreement. And when that agreement terminates, there is nothing left to support the easements' existence. The parties could have provided for the easements to survive, but they did not. The termination clause contains no exceptions for certain portions of the agreement. When the Double Loop Agreement terminates, it does so *in toto*.

This reading is reinforced by other portions of the Double Loop Agreement. Section 13, which grants "operation and use" easements, states that each party will grant the other easements over its own premises "to the extent reasonably required to permit the [other] to operate and use the Double Track Loop <u>as contemplated in this Agreement</u>." Filing 39-3 at 7 (emphasis supplied). The remainder of the agreement contemplates that numerous terms and conditions will apply to each party's use of the easements. For example, the agreement provides for cost-sharing, describes how the parties will schedule and coordinate usage of the tracks, mandates certain insurance coverage, and requires the parties to indemnify each other in certain cases. Filing 39-3 at 2-3, 5-6, 11-13.

But if Aventine's reading of section 8 is correct, the easements are allowed to continue (apparently indefinitely) without any of these conditions or protections. Aventine contends that none of these provisions needed to be set forth in writing in order to create an easement. True, easements can be created without expressly agreeing upon these sort of details, and the common law and any relevant statutes will fill in the gaps. But Aventine and Aurora Co-op went to the trouble of insisting upon these conditions, and it

- 14 -

does not make sense for the easements to continue, apart from them, absent some affirmative statement to that effect.

The Court is not persuaded by Aventine's invocation of the *expressio unius* principle. This rule of interpretation "is based on logic and common sense. It expresses the learning of common experience that when people say one thing they do not mean something else." *Metzger v. DaRosa*, 805 N.E.2d 1165, 1172 (Ill. 2004); *see also* 2A N. Singer, *Sutherland on Statutory Construction* § 47:25 (7th ed. 2013). The Court will not use the rule to reach a result which, as shown above, runs counter to common sense and the parties' intent, as reflected in the contract as a whole.

Aventine presents several additional arguments in support of its interpretation, but none are convincing. First, Aventine presses the flip side of its *expressio unius* argument. Unless Aventine's interpretation is adopted, it argues, the phrase "and the easements granted herein" which appears twice in the section 8, is rendered superfluous. If possible, the Court must give effect to every part of the parties' agreement. *Hearst-Argyle Properties, Inc. v. Entrex Communication Services, Inc.*, 778 N.W.2d 465, 470 (Neb. 2010). But Aventine's interpretation is not necessary to give effect to these phrases. The initial uses of the phrase were necessary to show that the Agreement and easements were meant to begin and end together. But having established that point, there was no need to continue stating "and the easements granted herein" *ad nauseam*.

Next, Aventine points to the "survival" clause of the Double Loop Agreement, which provides that all terms and conditions of the agreement which, "by their terms contemplate or require performance which is to extend beyond or occur after the termination of this Agreement shall not be deemed to expire on termination, but shall instead survive termination." Filing 39-3 at 16. Aventine argues that this suggests the easements were intended to survive termination of the agreement. This argument would be more convincing if there were no other parts of the contract that contemplated ongoing operation. But that is not the case. For example, the indemnification provisions require the parties to reimburse one another for covered liabilities, regardless of when the acts giving rise to liability occur or when the liability is established. Filing 39-3 at 11–13. More importantly, the survival clause only applies to portions of the agreement which "*by their terms* contemplate or require performance" extending beyond termination of the agreement. Filing 39-3 at 16 (emphasis supplied). As such, it provides no independent basis to infer that the easements survive termination.

Aventine next points to a similar "term" provision in the "NELLC Easement Agreement." That agreement, signed on the same day as the Double Loop Agreement, was executed between Aurora Co-op, Aventine, and

- 15 -

Nebraska Energy, LLC (NELLC), a limited liability company owned by Aventine. Filing 34-8. NELLC owns a small portion of the land under the Double Track Loop. Filing 39-24 at ¶¶ 5–6 & pp. 3–4. NELLC agreed to grant Aventine and Aurora Co-op an easement over its land to construct and operate the Double Track Loop.[11] Filing 34-8 at 3. The term section of the agreement provides, in relevant part:

> The initial term of this Agreement and the easement granted herein shall commence on August 1, 2006 . . . and shall continue thereafter for a term of ninety-nine (99) years . . ., except as is expressly provided below . . . . Anything herein to the contrary notwithstanding, <u>the easement granted herein and this Agreement</u> shall terminate as follows:
>
> > A. As to Aventine only, at completion of the closing, in the event Aurora Co-op purchases the Aventine Premises.

Filing 34-8 at 3 (emphasis supplied).

Aventine argues that this shows the parties knew how to draft an agreement that provides for immediate termination of an easement under certain circumstances, and the fact that similar language was not contained in the Double Loop Agreement shows its easements were meant to survive. But the NELLC agreement is not a useful comparator. Besides involving a third party who did not sign the Double Loop Agreement, it deals with a different situation. Under the NELLC agreement, Aurora Co-op will retain its easement and the Agreement will survive, as between Aurora Co-op and NELLC, even if Aventine is no longer in the picture. In the NELLC agreement, the parties needed to make it clear that Aurora Co-op would retain its easement *and* that the agreement would carry on. There was no need for such specificity in the Double Loop Agreement.

---

[11] The Court is not permitted to consider extrinsic evidence to explain the terms of a contract that is not ambiguous. *Spanish Oaks, Inc. v. Hy-Vee, Inc.*, 655 N.W.2d 390, 403 (Neb. 2003). Nor may the Court consider extrinsic evidence when deciding whether ambiguity exists. *Sack Bros. v. Great Plains Co-op., Inc.*, 616 N.W.2d 796, 804 (Neb. 2000). But the NELLC agreement was part of a related series of contracts between Aventine and Aurora Co-op, and instruments made in reference to and as part of a transaction are to be considered and construed together. *Norwest Corp. v. State, Dept. of Ins.*, 571 N.W.2d 628, 634 (Neb. 1997). All of these agreements were part of one transaction: the development and operation of the ethanol plant. So, the Court considers the NELLC agreement without running afoul of the bar on extrinsic evidence.

Aventine next contends that Aurora Co-op's reading of the Double Loop Agreement allows Aurora Co-op to seize what amounts to complete control over the crossover tracks and switches, which will result in a forfeiture of Aventine's property interest in the tracks and switches. Aventine cites *Connecticut Fire Ins. Co. v. Jeary*, 83 N.W. 78, 79 (Neb. 1900), for the proposition that "forfeiture clauses are to be looked upon with ill favor" and that courts will strictly construe contracts to avoid a forfeiture. Again, the Court is not persuaded. First, as noted above, Aventine has failed to articulate the nature of its property interest. Second, *Jeary* arose in the insurance context. *Id.* The rule for which Aventine cites *Jeary* was used to avoid the harsh results of denying coverage based upon a mere "technical defense" that "operate[d] as a trap to enable the company to receive its premium," and would come as a surprise to the insured who had acted in fair reliance on the policy. *Id.* Aventine has not explained why or how this rule should apply to the present context; nor does section 8 strike the Court as a trap for the unwary. Finally, given the Court's understanding of the Double Loop Agreement as a whole, there is no way to arrive at Aventine's interpretation merely by giving the clause a "strict construction." Rather, the Court would be put in the position of re-writing the parties' entire agreement.

In a related vein, Aventine argues that the parties could not have intended to reach such an inequitable result. Aventine maintains that Aurora Co-op breached the Grain Supply Agreement, which entitled Aventine to terminate the agreement. And it would be fundamentally unfair, Aventine argues, for Aurora Co-op to be able to take advantage of its own breach of the Grain Supply Agreement by taking complete control of the Double Loop, terminating Aventine's easement rights, and causing Aventine to forfeit its ownership interest in the tracks.[12] Filing 34-1 at 16. The parties could not have intended such an inequitable result, Aventine argues, and so this portion of the Double Loop Agreement must have been the result of a mutual mistake. Therefore, Aventine urges the Court to reform the contract to express the parties' true intention—that the easements survive termination.

Contract reformation is an equitable remedy which allows the Court to correct a mutual mistake by the parties to a contract that prevented the contract from expressing their true intent. *R and B Farms, Inc. v. Cedar Valley Acres, Inc.*, 798 N.W.2d 121, 128 (Neb. 2011). Mutual mistake exists where there has been a meeting of the minds of the parties and an agreement

---

[12] However, nothing obligated Aventine to terminate the Grain Supply Agreement simply because it believed Aurora Co-op was in breach. Aventine could have sued for damages and suspended its own performance under that agreement without terminating it and triggering the end of the Double Loop Agreement.

actually entered into, but the agreement in its written form does not express what was really intended by the parties. *Id.* at 129. To overcome the presumption that an agreement correctly expresses the parties' intent, the party seeking reformation must offer clear and convincing evidence of such a mistake. *Id.*

Aventine has not offered any evidence of a mutual mistake. This is reason enough to deny reformation. *See id.* at 130. Moreover, Aurora Co-op has presented evidence that there was no mistake in drafting the termination clause. Aurora Co-op's president and CEO, George Hohwieler, was involved in the negotiation of the Grain Supply and Double Loop Agreements. Filing 39-21 at ¶ 14. Hohwieler averred that "[t]he right to access the BNSF railroad to and from the ethanol plant was tied to the existence of an exclusive grain supply agreement at every step of the negotiations with Aventine." Filing 39-21 at ¶ 15. And Hohwieler explained that the termination clause was an important part of the overall agreement; Aurora Co-op wanted to be certain that Aventine had a strong incentive to abide by its obligations under the Grain Supply Agreement. Filing 39-21 at ¶ 15.

The fact that one of the parties to a contract denies that a mistake was made does not prevent a finding of mutual mistake or prevent reformation. *R and B Farms*, 798 N.W.2d at 128. But there is nothing unreasonable about Hohwieler's explanation, and Aventine has offered no evidence to rebut his account.

Aventine next argues that the parties "simply did not contemplate the disposition of the double track loop's infrastructure or their respective ownership and use rights of any portions of it in the event some or all of their agreements with each other dissolved." Filing 34-1 at 17. Aventine seeks to characterize this as "the unusual case of a contract that was sufficiently definite in forming a binding agreement but failed to clarify the parties' rights and duties in the event of a contingency that they both assumed would not occur." *City of Scottsbluff v. Waste Connections of Nebraska, Inc.*, 809 N.W.2d 725, 748 (Neb. 2011). In such a case, where the parties have not agreed upon a term which is essential to a determination of their rights and duties, courts will supply a term which is reasonable in the circumstances, and which "'comports with community standards of fairness and policy.'" *Id.* at 749 (quoting Restatement (Second) of Contracts § 204 cmt. d (1981)).

The rule set forth in *City of Scottsbluff* cannot be stretched to support Aventine's position, and the Court will not rewrite the parties' contract. In *City of Scottsbluff*, the court was asked simply to supply a missing price term. *Id.* at 749–50. Here, by contrast, Aventine asks the Court to fundamentally change the parties' bargain. The Court is not in the position to determine, on behalf of the parties, how to manage the easements now that relations have

hit a rocky patch. This is a question of a different order of complexity than deciding upon a reasonable price. It is not the Court's role to rewrite the contract to reflect its own view of a fair bargain. *Id.* at 748.

Finally, the Court turns to Aurora Co-op's counter-argument: that Aventine's attempt to terminate the Grain Supply Agreement amounted to an anticipatory repudiation, which entitled Aurora Co-op to suspend performance under the Double Loop Agreement. An anticipatory repudiation or breach of contract is one committed before the time has come when there is a present duty of performance and is the outcome of words or acts evidencing an intention to refuse performance in the future. *Sack Bros. v. Tri-Valley Co-op., Inc.*, 616 N.W.2d 786, 795 (Neb. 2000). And where two agreements are "inextricably intertwined," a breach of one agreement may excuse performance under the other. *Gary's Implement, Inc. v. Bridgeport Tractor Parts, Inc.*, 702 N.W.2d 355, 370 (Neb. 2005).

If Aventine was not entitled to terminate the Grain Supply Agreement, then its letter, purporting to do so, was clearly an expression of its intent to refuse performance in the future. Thus, the only question is whether the two agreements were inextricably linked. The Court finds that they were; or, more precisely, that Aurora Co-op has demonstrated a sufficient likelihood of proving this point at trial. The Double Loop Agreement could not be much more clear on the matter: it only existed to further the exchange of grain, ethanol, and ethanol byproducts under the Grain Supply Agreement, and only lasted so long as the Grain Supply Agreement remained in effect. *Cf.*, *id.*; *Norwest Corp.*, 571 N.W.2d at 634. While the Court does believe this issue could benefit from further development, there is no need to dwell on it further at this time. Aventine has not provided any persuasive argument to the contrary, and the entire issue may be moot if it is first determined that Aventine was entitled to terminate the Grain Supply Agreement.

Overall, the Court finds that Aventine has not demonstrated a significant likelihood of success on the merits. However, there remain some issues of fact and law that are sufficiently complex and uncertain to warrant further development. If Aventine had made a showing of irreparable harm, those issues might have been enough to present a fair ground for litigation.

### III. The Remaining *Dataphase* Factors

The Court finds that both the balance of harms and public interest favor a grant of injunctive relief. However, as noted above, this is not enough in the absence of irreparable harm.

Aurora Co-op argues that if the injunction is issued, it will be harmed because Aventine will be trespassing upon its real property, which in some circumstances may be considered an irreparable harm. *See, e.g.*, *F. Burkart*

*Mfg. Co. v. Case*, 39 F.2d 5 (8th Cir. 1930). But Aurora Co-op's real, underlying argument seems to be that its ability to block Aventine's rail access is invaluable leverage, which Aurora Co-op needs to help ensure that Aventine will pay what Aurora Co-op alleges it is owed under the Grain Supply Agreement. Even if the Court accepts Aurora Co-op's arguments, these harms simply do not stack up against the economic harm that Aventine faces. The Court also notes that, to the extent that Aventine is able to make a profit producing some ethanol, it is *more*, not less likely that Aurora Co-op will be able to collect any judgment it might obtain against Aventine.

Granting the injunction may also serve the public interest. If Aventine were able to profitably operate the plant, the public benefits would be immediate and concrete. Aventine has shown that it would need to hire approximately 15 new employees to run the plant. Filing 34-10 at ¶ 15. The economic impact would not end there. BNSF would receive additional revenue from the traffic and the Department of Agriculture would have a buyer for its excess sugar. Instead, Aventine's Aurora plant sits idle.

The parties' current predicament is certainly not ideal. But despite that, and however much the equities of the situation potentially favor Aventine, injunctive relief is not available at this time. Accordingly,

IT IS ORDERED:

1. Aventine's Emergency Motion to Enforce Stay and for Temporary Restraining Order and Preliminary Injunction (filing 34) is denied.

Dated this 6th day of March, 2014.

BY THE COURT:

John M. Gerrard
United States District Judge