IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| AURORA COOPERATIVE ELEVATOR COMPANY,<br><br>              Plaintiff,<br><br>vs.<br><br>AVENTINE RENEWABLE ENERGY HOLDINGS, INC., AVENTINE RENEWABLE ENERGY, INC., and AVENTINE RENEWABLE ENERGY – AURORA WEST, LLC,<br><br>              Defendants. | 4:12-CV-3200<br><br><br>MEMORANDUM AND ORDER |
| AURORA COOPERATIVE ELEVATOR COMPANY,<br><br>              Plaintiff,<br><br>vs.<br><br>AVENTINE RENEWABLE ENERGY HOLDINGS, INC., AVENTINE RENEWABLE ENERGY – AURORA WEST, LLC,<br><br>              Defendants. | 4:14-CV-3032<br><br><br>MEMORANDUM AND ORDER |

      This matter is before the Court on two motions, in two separate cases, involving substantially the same parties and raising overlapping and related issues of law and fact. The plaintiff in both cases is Aurora Cooperative (Aurora), a Nebraska corporation located in Aurora, Nebraska. Case no. 4:12-cv-3200, filing 1 at ¶ 1.[1] Defendants Aventine Renewable Energy Holdings and Aventine Renewable Energy are corporations based in other states and

---

[1] Unless otherwise indicated, citations to the record in this introduction and in the factual background of this order refer to filings from case no. 4:12-cv-3200.

registered to do business in Nebraska, and Aventine Renewable Energy – Aurora West is a limited liability company whose sole member is Aventine Holdings (collectively, "Aventine"). Filing 1 at ¶¶ 2–4; filing 20 at ¶¶ 2–4, 60–62.

In case no. 4:12-cv-3200 (the "Grain Lawsuit"), Aventine has filed a motion for leave to amend its answer and counterclaims. Filing 49. And in case no. 4:14-cv-3032 (the "Easement Lawsuit"), Aventine has moved to dismiss Aurora's complaint, or in the alternative, consolidate that case with the Grain Lawsuit. Filing 20. For the reasons discussed below, both motions will be granted in part and denied in part.

# I. FACTUAL BACKGROUND[2]
## A. Development of the Aurora West Site

Around 2006, Aurora acquired an agri-business complex on an industrial site just west of the city of Aurora (the "Aurora West site"). Filing 39-21 at ¶ 4. The site is bounded to the north by U.S. Highway 34, and to the south by a Burlington Northern Santa Fe (BNSF) railroad line. Filing 39-21 at ¶ 4; filing 39-24 at 3. In June 2006, Aurora sold Aventine a large portion of the land within the site. Filing 20-1. And in August 2006, Aventine and Aurora entered into a series of agreements, including a "Master Development Agreement," which related to the development of an ethanol plant on the land Aventine had purchased. Filing 1 at ¶¶ 8–9; filing 20-2; filing 39-21 at ¶ 6. The parties' agreements provided for the development of roads, rail tracks, and other infrastructure needed to operate the plant, and envisioned that Aventine would operate the plant using grain provided by Aurora. Filing 1 at ¶ 8; filing 20-2 at 1–12; filing 20-3; filing 39-21 at ¶¶ 5–8. Aventine constructed the plant, and Aurora built a grain elevator and grain storage facility. Filing 20-2 at 1–11; filing 39-21 at ¶¶ 5, 16.

## B. The Double Track Loop

---

[2] This recitation of the facts is drawn, in part, from the Court's previous Memorandum and Order of March 6, 2014, denying Aventine's motion for a preliminary injunction. Filing 49. It includes references to materials, such as affidavits, that the Court may not consider when ruling on certain aspects of Aventine's pending motions. For example, in reviewing whether Aventine's motion to amend should be denied as futile—i.e., as unable to state a claim for relief under Rule 12(b)(6)—the Court may not generally consider matters outside the pleadings. Fed. R. Civ. P. 12(d). On the other hand, these outside materials are properly considered in weighing Aventine's challenges under Rule 12(b)(1). *See Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). Mostly, the Court has provided this recitation for background purposes, and where required, the Court has limited its consideration to matters embraced by the pleadings.

Much of the present disputes concern a pair of railway tracks that surround the Aurora West site and Aventine's ethanol plant—the "Double Track Loop." The Loop is shaped roughly like an athletic track and consists of two sets of railway tracks (the "Interior and Exterior Loops"). Filing 39-21 at ¶ 11; filing 39-5; filing 39-18; filing 39-22 at ¶ 6; filing 39-24 at 1–3. The Inner and Exterior Loops are (with exceptions not relevant here) situated on land owned by Aventine and Aurora, respectively. A service road runs between the two tracks, and the line dividing the parties' property runs down the middle of the road. Filing 39-21 at ¶ 11; filing 39-24 at ¶¶ 5–8 & p. 3.

On the southern border of the Aurora West site, the Double Track Loop runs parallel to the BNSF line. A set of crossover tracks and switches connects the Exterior Loop to the BNSF line, and another set of tracks and switches connects the Exterior and Interior Loops. Filing 39-21 at ¶¶ 11, 13; filings 39-5, 39-6, and 39-7; filing 39-18; filing 39-24 at 3. In order to move from the BNSF line to the Interior Loop (or vice versa), a railcar must pass over one set of crossover tracks, then travel along the Exterior Loop for a short distance, then pass over another set of crossover tracks. The Court will refer to the small portion of the Exterior Loop that lies between the crossover tracks as the "Switching Portion."

### C. THE PARTIES' AGREEMENTS

Among the agreements signed by Aventine and Aurora in August 2006, three are particularly important to the present dispute. The first is the Double Track Loop Easement and Use Agreement (the "Double Loop Agreement"). Filing 39-3. Under this agreement, Aventine and Aurora granted each other easements over certain parcels of real estate owned by the other party and over the portion of the Double Track Loop located on that real estate. Filing 39-3 at 2, 6–7.

The second contract is the Grain Supply Agreement. Filing 20-3. It is essentially a requirements contract, whereby Aventine agreed to purchase from Aurora, on an exclusive basis, "all of the [g]rain which Aventine requires to operate the Aventine Ethanol Plant." Filing 20-3 at 3. The agreement allows Aurora to furnish the grain from its own farmer members or to procure it from third parties. Filing 20-3 at 5–8. Each grain purchase was to give rise to and be governed by a separate "Grain Contract." Any dispute arising under a Grain Contract is subject to arbitration through the National Grain and Feed Association (NGFA). Filing 20-3 at 2.

The third contract is the Aventine Marketing Agreement. The Marketing Agreement gave Aurora the exclusive right to market byproducts of the ethanol production process produced by the Aurora West plant. Filing 20 at ¶ 67; filing 20-4.

- 3 -

### D. Construction of the Plant

The Master Development Agreement originally provided that Aventine's ethanol plant would be completed and fully operational on or before July 11, 2009. Filing 1 at ¶ 12; filing 20-2 at 5, 15. However, construction of the new plant did not proceed as the parties had envisioned. *See* filing 1 at ¶¶ 20–23. In March 2010, Aventine and Aurora entered into a new agreement (the "2010 Agreement") which amended various aspects of the parties' existing agreements, and moved the completion deadline for the plant to July 1, 2012. Filing 1 at ¶¶ 25–27.

Once more, things did not proceed as the parties had intended. By July 2012, the plant was complete and operational, in that it was capable of producing ethanol.[3] *See* filing 20 at ¶ 75. But by then Aventine had determined that it was not profitable to produce ethanol using corn. Filing 34-10 at ¶ 11. So, on July 3, 2012, Aventine informed Aurora that it would not be operating the plant, at least for the time being. Filing 1 at ¶ 34.

### E. Disputes Arising in the Summer of 2012

According to Aurora, in May and June 2012, the parties were in frequent contact concerning the procurement of grain for Aventine's anticipated start-up in July 2012. Filing 1 at ¶ 29. Throughout this period, the parties engaged in several grain transactions. *See, e.g.*, filing 1 at ¶¶ 29–41; filing 20 at ¶¶ 29–41, 70–76; filing 49-1 at pp. 10–13.

On June 14, 2012, Aventine agreed to price 300,000 bushels of corn from Aurora. Aurora sent a pricing confirmation (filing 20-7), identified as contract No. 015499-02, with delivery to occur on or before July 30. Filing 1 at ¶ 30; filing 20 at ¶ 30. Thus, the parties had formed a "Grain Contract" under the Grain Supply Agreement. Aventine paid Aurora in advance for 70,000 bushels,[4] and accepted delivery of those bushels in June. Filing 1 at ¶

---

[3] The 2010 Agreement granted Aurora the right to repurchase the site (and plant) for a significantly reduced price, in the event Aventine failed to "diligently pursue construction of the Aurora West Facility to completion on or before July 1, 2012." Filing 20-5 at 5. In a separate lawsuit that is also before this Court, Aurora seeks to show that the plant was not "complete" or "operational" as defined in the parties' agreements, such that Aurora should be allowed to exercise that option. *See, e.g.*, case no. 4:12-cv-230, filings 1, 44, and 172.

[4] Aurora claims that this delivery actually consisted of 80,163.75 bushels, while Aventine states it was for 70,000. It is not clear if the parties actually disagree, as Aurora may be including an additional 10,000 bushels in its figures which were actually provided earlier in June 2012 under a separate Grain Contract. *See,* filing 1 at ¶¶ 30–31; filing 20 at ¶¶30–31; filing 20-6; filing 20-7; filing 49-1 at p. 12. To the extent this discrepancy matters, it need not be rectified at this time.

- 4 -

31; filing 20 at ¶ 31. That same month, Aventine ran the Aurora West plant using these bushels. A byproduct of this operation was wet distiller's grain, one of the byproducts covered by the Marketing Agreement. Aurora accepted this byproduct and later sold it for approximately $130,000 in July. Aventine claims that, under the Marketing Agreement, Aurora owes Aventine this money. Filing 20 at ¶¶ 75–76. Aurora has yet to pay, for reasons that will be explained below.

Around the same time, from May to July 2012, Aurora alleges that it acquired approximately 1.7 million bushels of corn "on behalf of Aventine pursuant to Aventine's specific instructions to do so and upon the representation that Aventine intended to start up and operate the Plant." Filing 1 at ¶ 32. Aventine disputes that it directed Aurora to purchase this grain. Filing 20 at ¶ 32. Instead, Aventine contends that this accumulation of grain was part of an effort by Aurora to use "the parties' contractual relationships as leverage to coerce Aventine . . . into operating its ethanol plant at a loss," which was, in turn, an effort to force Aventine into financial ruin so that it would agree to Aurora's purchase of the ethanol plant at an extremely discounted price. Filing 50 at 5.

Either way, on July 3, 2012, Aventine informed Aurora that it would not be operating the Aurora West plant for the foreseeable future. So, Aventine instructed Aurora that it would not be taking delivery of the 230,000 bushels of corn that were remaining under contract no. 015499-02. Aventine also declined to take delivery of the "disputed corn," that is, the 1.7 million bushels that Aurora claims it had been accumulating for Aventine. Filing 1 at ¶¶ 34–35, 38; filing 20 at ¶¶ 34–35, 38.

Under the Grain Supply Agreement, all cash positions that Aurora held for Aventine's benefit were to be converted to grain contracts on the first and fifteenth of each month. Filing 1 at ¶ 36; filing 20 at ¶ 36; filing 20-3 at 7. So, Aurora claims that, on July 16 (the 15th was a Sunday), the 1.7 million bushels were converted to a grain contract (no. 015548-02). Filing 1 at ¶ 36. And Aurora alleges that, pursuant to the 2010 Agreement (which amended portions of the Grain Supply Agreement), payment was due in advance of delivery and was therefore due immediately. Filing 1 at ¶ 37.

Aurora alleges that it was able to sell the 230,000 bushels remaining under contract no. 015499-02 at a net gain of approximately $280,000. However, Aurora claims that on its sale of the 1.7 million bushels, it sustained a loss of $2.1 million. Filing 1 at ¶¶ 38–40. Under the Grain Supply Agreement, Aurora owed Aventine the gain of $280,000 from the first transaction. Filing 1 at ¶ 41; filing 20 at ¶ 74. But Aurora claims that, under the Grain Supply Agreement, Aventine owes it for the $2.1 million loss. So, on or about August 15, 2012, Aurora informed Aventine that it was simply

deducting the $280,000 from the $2.1 million that it claimed Aventine owed. Aurora alleges that, after this set-off, Aventine still owes it approximately $1.8 million. Filing 1 at ¶¶ 41–44; filing 20-9. On September 17, 2012, Aurora initiated arbitration proceedings before the NGFA to resolve the disputes arising from these grain contracts. Filing 1 at ¶ 43–44.

For its part, Aventine maintains that it owes Aurora nothing for the 1.7 million bushels of corn, as these bushels were not procured for Aventine's benefit and were never part of a valid grain contract. *See* filing 50 at 4–6. Instead, Aventine contends that Aurora owes it $280,000 under the Grain Supply Agreement and $130,000 under the Marketing Agreement. Filing 20 at ¶¶ 73–76. On September 18, 2012, the day after it initiated arbitration proceedings, Aurora received a letter from Aventine's CEO, John W. Castle. He wrote that Aventine was terminating the Grain Supply and Marketing Agreements, based on Aurora's failure to pay. Filing 1 at ¶ 45; filing 20 at ¶ 45; filing 20-8.

Aurora counters that it did not receive sufficient notice that the $130,000 was due. Filing 1 at ¶ 48. Alternatively, Aurora maintains that it is also entitled to deduct this amount from the remaining $1.8 million that it claims Aventine owes. Filing 1 at ¶ 49.

### F. GRAIN LAWSUIT

Shortly after initiating arbitration, Aurora filed suit in this Court. Aurora seeks, among other things, a declaration that Aventine's purported termination of the Grain Supply and Marketing Agreements were not effective, that the agreements remains in effect, and that Aventine, not Aurora, has breached the agreements. Filing 1 at 14–16. Aventine counterclaimed, seeking a declaration to the opposite effect: that Aurora had breached the agreements, which Aventine then lawfully terminated. Filing 20 at 13–14. After these initial filings, the case was stayed pending arbitration. *See*, filings 26, 27, 28, 29, 30, 47, 48, and 56.

### G. THE RAIL DISPUTE AND THE EASEMENT LAWSUIT

In the fall of 2013, Aventine learned that it could acquire sugar at a favorable price from the U.S. Department of Agriculture. Aventine projected that, using sugar rather than grain, it could produce ethanol at a profit. Filing 34-10 at ¶ 12. So, Aventine contracted with the Department of Agriculture to purchase "enough sugar to operate at full capacity for several months." Filing 34-10 at ¶ 13. The sugar was to be delivered by rail, with the first shipment scheduled to arrive in mid-February 2014. Filing 34-10 at ¶ 16.

Around the beginning of January 2014, Aurora learned of Aventine's sugar plans. Filing 39-21 at ¶ 25; case no. 4:14-cv-3032, filing 1 at ¶ 40. In a letter dated January 28, 2014, counsel for Aurora wrote to Aventine to address what Aurora regarded as Aventine's "inconsistent positions" regarding the Grain Supply and Double Loop Agreements. Case no. 4:14-cv-3032, filing 1-8. Aurora maintained that pursuant to the Double Loop Agreement, the easements that it granted were terminated immediately (along with the Double Loop Agreement itself) in the event that either party terminated the Grain Supply Agreement. And, Aurora asserted, without these easements, Aventine had no right to access the Switching Portion of the Exterior Loop, which Aventine would need to use to ship railcars between the BNSF line and the Interior Loop. Case no. 4:14-cv-3032, filing 1-8.

The portion of the Double Loop Agreement that Aurora relied upon provides, in part:

> The initial term of this Agreement and the easements granted herein shall commence on August 1, 2006 . . . and shall continue thereafter for a term of twenty (20) years . . ., except as is expressly provided below. . . . Anything herein to the contrary notwithstanding, this Agreement shall terminate as follows:
>
> . . . .
>
> (B) Immediately in the event the then current Grain Supply Agreement between Aurora Co-op and Aventine expires or is terminated by either party.

Case no. 4:14-cv-3032, filing 1-3 at 4.

So, Aurora took the position that Aventine could not simultaneously claim that it had terminated the Grain Supply Agreement in September 2012 and continue to claim access to the easements granted by the Double Loop Agreement. Alternatively, Aurora maintains that Aventine's attempt to terminate the Grain Supply Agreement, while not effective, did amount to an anticipatory repudiation of that agreement. And, Aurora further argued, the Grain Supply and Double Loop Agreements were closely intertwined, such that a repudiation of one excused performance under the other. Thus, Aurora asserted that it was entitled to suspend performance under the Double Loop Agreement, such that it no longer had any obligation to allow Aventine on its land. *See, e.g.*, case no. 4:14-cv-3032, filing 1 at 11–14; case no. 4:12-cv-3200, filing 38 at 1–4, 25–29.

Aventine disagreed with Aurora's legal analysis, and on February 4, 2014, Aventine used the Switching Portion to move two railcars from the BNSF line to the Interior Loop. Case no. 4:14-cv-3032, filing 1 at ¶¶ 45–47. That same day, Aurora filed a new lawsuit in this Court, essentially seeking a declaration that its position above was correct and enjoining Aventine from using the Switching Portion or Exterior Loop unless Aventine retracted its position that the Grain Supply Agreement had been terminated. Case no. 4:14-cv-3032, filing 1 at 14–16.

However, that was not all Aurora did. On February 14, 2014, Aurora locked the switches at the Exterior Track Loop, effectively barring rail traffic from crossing between the BNSF line and the Interior Loop. Filing 39-21 at ¶ 30. Aurora then sent a final letter to Aventine, stating that it would remove the locks if Aventine provided written assurance that it would comply with the Grain Supply Agreement until the Court had arrived at a final determination of the parties' rights in the Grain Lawsuit. Filing 39-16.

In response, Aventine filed a motion for preliminary injunctive relief in the Grain Lawsuit. Filing 34. Aventine asked the Court to order Aurora to remove the locks and to enjoin Aurora from interfering with Aventine's use of the portion of the Exterior Loop it needed to conduct its business. The Court denied Aventine's motion, finding that while Aventine was facing significant economic harm from the lock-out, it had failed to demonstrate a threat of irreparable harm. Filing 46 at 6–8. The Court further found that Aventine had not demonstrated a likelihood of success on the merits. In other words, the Court found that Aurora's position was likely correct—that if the Grain Supply Agreement was terminated, so were the easements granted under the Double Loop Agreement. Alternatively, the Court determined, if Aventine's termination of the Grain Supply Agreement was not effective, it was nonetheless an anticipatory repudiation of that agreement, which entitled Aurora to suspend performance under the related Double Loop Agreement. Filing 46 at 9–19.

## II. STANDARD OF REVIEW

In the Grain Lawsuit, Aventine has filed a motion for leave to amend its answer and counterclaims. Case no. 4:12-cv-3200, filing 49. Aurora has resisted, arguing that leave to amend should be denied as futile, as the amended claims would not survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6). In the Easement Lawsuit, Aventine has moved to dismiss Aurora's complaint, or in the alternative, consolidate that case with the Grain Lawsuit. Case no. 4:14-cv-3032, filing 20. Aventine has brought its motion under both Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

## A. FED. R. CIV. P. 12(b)(1)

A motion pursuant to Fed. R. Civ. P. 12(b)(1) challenges whether the Court has subject matter jurisdiction. The party asserting subject matter jurisdiction bears the burden of proof. *Great Rivers Habitat Alliance v. FEMA*, 615 F.3d 985, 988 (8th Cir. 2010). Rule 12(b)(1) motions can be decided in three ways: at the pleading stage, like a Rule 12(b)(6) motion; on undisputed facts, like a summary judgment motion; and on disputed facts. *Jessie v. Potter*, 516 F.3d 709, 712 (8th Cir. 2008).

A Rule 12(b)(1) motion can be presented as either a "facial" or "factual" challenge. *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). When reviewing a facial challenge, the Court restricts itself to the face of the pleadings, and the nonmovant receives the same protections as it would facing a Rule 12(b)(6) motion. *Id.* By contrast, when reviewing a factual challenge, the Court considers matters outside the pleadings, and the nonmovant does not receive the benefit of Rule 12(b)(6) safeguards. *Id.* Moreover, unlike a motion for summary judgment, the Court is free to resolve disputed issues of fact. *Jessie*, 516 F.3d at 712.

## B. FED. R. CIV. P. 12(b)(6)

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* While the Court must accept as true all facts pleaded by the nonmoving party and grant all reasonable inferences from the pleadings in favor of the nonmoving party, *Gallagher v. City of Clayton*, 699 F.3d 1013, 1016 (8th Cir. 2012), a pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. *Iqbal,* 556 U.S. at 678. Determining whether a complaint states a plausible claim for relief requires the Court to draw on its judicial experience and common sense. *Id.* at 679.

On a motion for leave to amend the complaint, the Court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). But the Court has discretion to deny leave when amendment would be futile, such as when the allegations of the amended complaint nonetheless fail to state a claim. *See*, *Gandhi v. Sitara Capital Management, LLC*, 721 F.3d 865, 868–69 (7th Cir. 2013); *Hintz v. JPMorgan Chase Bank, N.A.*, 686 F.3d 505, 511 (8th Cir. 2012). So, the Court reviews the motion for leave to amend under the same standard as a motion to dismiss under Rule 12(b)(6).

## III. ANALYSIS
### A. Grain Lawsuit - Aventine's Motion to Amend

In its original counterclaim, Aventine sought a declaratory judgment that Aurora owed Aventine the amounts discussed above, that Aurora breached the Grain Supply and Marketing Agreements by not paying these amounts, that Aventine was entitled to terminate both agreements, and that both agreements were terminated. Case no. 4:12-cv-3200, filing 20 at ¶¶ 84–99. Aventine also requested a declaration that Aurora was not entitled to any set-off of these amounts—in other words, that Aventine was not obligated to purchase the 1.7 million bushels of grain, as claimed by Aurora. Filing 20 at pp. 12–14.

In its proposed amended counterclaim, Aventine seeks to convert its requests for declaratory relief to their "coercive" equivalents: "normal" claims for breach of contract. So, Aventine's proposed counterclaim asserts breach of contract claims based on Aurora's failure to pay sums allegedly due under the Grain Supply and Marketing Agreements. Aventine has also added several new claims for relief, which the Court will discuss below. Aurora argues that Aventine's request to amend its counterclaims should be denied as futile, as the amended claims are all either subject to arbitration or fail to state claims for relief. *See* case no. 4:12-cv-3200, filing 52. The Court will consider each of the proposed amendments in turn.

The Court begins with Aventine's proposed claims which have simply been converted from requests for declaratory relief to their coercive equivalents. Aurora argues that Aventine should not be allowed to convert its existing claims because the underlying disputes—the amounts owed under the Grain Supply and Marketing Agreements—are subject to arbitration and, in fact, are currently being arbitrated. But as Aventine points out, the same can be said for its existing claims for declaratory relief. And Aventine agrees that its amended claims will also be stayed pending arbitration. *See* case no 4:12-cv-3200, filing 54 at 4.

Aurora has not explained how it will be prejudiced by this amendment. The fact that Aventine's claims will change from declaratory to coercive does not meaningfully prejudice Aurora. Aurora is already facing the possibility of damages: the Declaratory Judgment Act authorizes the Court to award any "[f]urther necessary or proper relief based on a declaratory judgment," 28 U.S.C. § 2202, which includes damages. *See, Noatex Corp. v. King Const. of Houston, L.L.C.*, 732 F.3d 479, 487 (5th Cir. 2013); *Royal Indem. Co. v. Apex Oil Co.*, 511 F.3d 788, 793–94 (8th Cir. 2008). So, Aventine will be permitted to amend its existing claims to convert them to requests for coercive relief.

The Court turns next to Aventine's new claims. First, Aventine contends that Aurora also breached the Grain Supply Agreement by claiming

to accumulate 1.7 million bushels of grain on Aventine's behalf, when Aventine had not, in fact, ordered that grain. Aventine argues that accumulating this grain was a calculated strategy on Aurora's part—a bad-faith attempt to manipulate Aventine—and that this conduct materially impaired the value of the entire Grain Supply Agreement. *See* case no. 4:12-cv-3200, filing 54 at 2–3. Aventine also claims that the manner in which Aurora calculated its request for payment on those bushels amounted to a breach of the Grain Supply Agreement. Case no. 4:12-cv-3200, filing 49-1 at ¶¶ 17–25, 38, 53.

Once more, Aurora simply argues that Aventine should not be allowed to assert these claims because they are subject to arbitration. Aventine counters that these claims concern the Grain Supply Agreement as a whole, and do not "arise out of" individual grain contracts, such that they are not subject to arbitration. At this time, the Court need not determine the precise contours of these claims, nor whether they are subject to arbitration. Just as with the previous "converted" claims, these claims' status relative to the parties' arbitration is not a reason to deny Aventine leave to amend. If the new claims are subject to arbitration, then they can be stayed; if not, then Aurora has provided no reason Aventine should not be allowed to assert them.

Finally, Aventine has proposed two new claims arising out of the parties' easement dispute. First, Aventine contends that, by locking Aventine out and blocking its access to the BNSF main line, Aurora has breached the Double Loop Agreement. Case no. 4:12-cv-3200, filing 49-1 at ¶¶ 67–74. Second, Aventine claims that this lock-out also violated the Grain Supply Agreement. Filing 49-1 at ¶ 53d. Aurora argues that neither states a claim for relief, and leave to amend should be denied as futile. The Court agrees.

The Court begins with Aventine's claim that the lock-out violated the Grain Supply Agreement. This fails to state a claim for the simple reason that, according to Aventine, the Grain Supply Agreement had already been terminated when the lock-out occurred. Aventine alleges that it terminated the agreement in September 2012. *See* case no. 4:12-cv-3200, filing 49-1 at ¶¶ 43-46. If that is true, then Aurora could not have breached it in January 2014, as there was no agreement to breach. Aventine is, of course, allowed to plead inconsistent facts in support of alternative theories of recovery. Fed. R. Civ. P. 8(d)(3); *Babcock & Wilcox Co. v. Parsons Corp.*, 430 F.2d 531, 536 (8th Cir. 1970). So, Aventine could have pleaded in the alternative—premising its lock-out claim on the survival of the Grain Supply Agreement. But as the Court reads Aventine's proposed counterclaim, that is not what Aventine has

- 11 -

alleged. As to this portion of Aventine's proposed claim, leave to amend is denied as futile.[5]

The Court turns finally to Aventine's claim that Aurora's lock-out breached the Double Loop Agreement. This claim formed the basis of Aventine's motion for a preliminary injunction. And in denying Aventine's motion for injunctive relief, the Court determined that the claim was likely without merit—whether or not the Grain Supply Agreement was terminated. *See* case no. 4:12-cv-3200, filing 46 at 12–19. Due to the procedural posture of the ruling—on an expedited motion for preliminary injunctive relief—the Court cautioned that its ruling was necessarily preliminary. *See* filing 46 at 13, 19. But Aventine has not offered the Court any reason to modify its previous finding. The Court thoroughly addressed a number of arguments Aventine made in support of its claim at that time, and rejected each of them. So, the Court finds that its previous determination remains correct. For the reasons stated in its previous order, the Court finds that Aventine's lock-out claim fails to state a claim for relief, and its motion for leave to amend will be denied as futile.

For the sake of clarity, the Court notes that this portion of its previous ruling was made solely on the basis of the parties' agreements, which are materials necessarily embraced by the pleadings and thus part of the record properly before the Court at this time. Fed. R. Civ. P. 12(d); *see, Stahl v. United States Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003); *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

In its previous order, the Court also found that that Aurora did, in fact, own the real estate under the Exterior Loop and its half of the Switching Portion. *See* case no. 4:12-cv-3200, filing 46 at 10–11. That finding was made on the basis of affidavits and other materials not properly considered at this time. *See* Fed. R. Civ. P. 12(d). But the Court's present decision does not depend on that aspect of its previous order. Aventine's claim for breach of the Double Loop Agreement presupposes that Aventine needs an easement to access rails that lie on land belonging to Aurora. In other words, as the Court understands Aventine's proposed counterclaim, it has only alleged that Aurora's interference with Aventine's access to the rails was wrongful as a breach of contract, not under some other legal theory premised on Aventine's (joint) ownership of the tracks themselves or the underlying real estate.

Aventine has alleged that it is not clear what, if any, ownership interest either party has in any particular portion of the Double Track Loop arrangement. Case no. 4:12-cv-3200, filing 49-1 at ¶ 16. It is not entirely clear

---

[5] This is not to say that Aventine could not plead such an alternative claim. At this time, the Court has no reason to determine whether such a claim would be viable.

if Aventine is referring to the tracks themselves, the underlying real estate, or both. But Aventine has not tied these allegations to any viable claim for relief. Under its claim for breach of the Grain Supply Agreement, Aventine alleges that it has suffered damages due to Aurora's "appropriation" of Aventine's property, including the cross-over tracks and switches that it helped pay to construct and maintain. Filing 49-1 at ¶ 60. But Aventine claims that the Grain Supply Agreement had already been terminated when this alleged misappropriation occurred, so it could not have been a breach of that agreement.[6]

To summarize: Aventine may amend its counterclaim to assert its "converted" claims for coercive relief and its claims that Aurora breached the Grain Supply Agreement by procuring the 1.7 million bushels of corn and by the manner in which Aurora calculated its costs for those bushels. Aventine's remaining proposed amendments fail to state claims for relief, and leave to amend will be denied as futile.

### B. EASEMENT LAWSUIT - AVENTINE'S MOTION TO DISMISS

In its complaint in the Easement Lawsuit, Aurora seeks a declaration that, so long as Aventine maintains it has terminated the Grain Supply Agreement, Aurora may suspend performance of its obligations under the Double Loop Agreement. Aurora also seeks a declaration that "Aventine has no right to use the portion of the Double Track Loop and Additional Track Switch that [are] located on land owned by Aurora Co-op for any purpose." Case no. 4:14-cv-3032, filing 1 at ¶¶ 55–57. And Aurora seeks an injunction prohibiting Aventine from using any portion of the loop, or the switch, located on land owned by Aurora, so long as Aventine maintains that it has terminated the Grain Supply Agreement. Case no. 4:14-cv-3032, filing 1 at 15–16.

Aventine's motion to dismiss rests on two grounds.[7] First, Aventine contends that Aurora's claims for injunctive and declaratory relief are moot. Second, Aventine asks the Court to exercise its discretion to decline to hear Aurora's claim for declaratory relief. The Court begins with Aurora's request for injunctive relief. Aventine correctly observes that this request has been mooted by the parties' conduct.

---

[6] This is not to say that Aventine cannot amend its counterclaim to raise these alleged damages in some other manner.

[7] In its initial brief, Aventine also argued that service of process was insufficient. *See* filing 21 at 4–5. But following Aventine's motion to dismiss, Aurora re-served process. *See* filings 31 and 33. Aventine has not argued that this new service was lacking in any regard, *see* filing 32, and the Court considers the matter resolved.

Article III of the Constitution grants federal courts the power to hear "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. To satisfy the irreducible constitutional minimum of Article III standing, a plaintiff must establish that it has suffered an injury in fact that is concrete and particularized and actual or imminent, not conjectural or hypothetical; that there is a causal connection between the injury and the conduct complained of; and that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Constitution Party of South Dakota v. Nelson*, 639 F.3d 417, 420 (8th Cir. 2011). A case becomes moot—and therefore no longer a case or controversy for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome. *Teague v. Cooper*, 720 F.3d 973, 976 (8th Cir. 2013). The Court will dismiss a case as moot when changed circumstances have already provided the requested relief and eliminated the need for court action. *Id.*

Since filing this lawsuit, Aurora has installed locks that have effectively blocked Aventine from accessing any portion of the Exterior Track Loop or Switching Portion that lies on Aurora's land. This has not changed in the approximately 9 months since Aurora installed the locks. Aventine has not taken any steps to remove the locks, and there is no suggestion it is going to do so any time soon. In other words, there is no longer any actual or imminent threat that Aventine will trespass upon the Switching Portion or any portion of the Exterior Track Loop that lies on Aurora's land.[8] So, there is nothing to enjoin, and Aurora's request for injunctive relief is moot. The same is true for Aurora's request for a declaration that "Aventine has no right to use the portion of the Double Track Loop and Additional Track Switch that [are] located on land owned by Aurora Co-op for any purpose." Case no. 4:14-cv-3032, filing 1 at ¶¶ 55–57.

However, Aurora's other request for declaratory relief—that Aurora is not violating the Grain Supply Agreement by locking Aventine out—is not moot. Aurora is essentially seeking a declaration of non-liability.[9] This claim

---

[8] There is, however, a portion of the Exterior Loop that lies on land belonging to NELLC, which has granted Aurora and Aventine an easement to construction and operation of the track loop. Aventine and NELLC have recently undertaken efforts to modify that portion of the Loop in order to allow Aventine access to the BNSF main line. Aurora has separately moved to enjoin these efforts. *See* filing 34. The analysis governing these matters is distinct from the present dispute and will be addressed in a separate memorandum and order. The present dispute is limited to determining the parties' rights with respect to land owned by Aurora.

[9] That is a proper use of the Declaratory Judgment Act, which allows a party like Aurora "who expects to eventually be sued, to determine [its] rights and liabilities without waiting

is not moot because as Aurora continues to lock Aventine out, Aventine's damages from being unable to access the railroad will continue to accrue. There is an actual, concrete dispute between the parties, as demonstrated by the fact that Aventine has already filed suit to recoup these costs, by way of its proposed amendments to its counterclaim in the Grain Lawsuit. The fact that the Court has denied leave to plead those claims as futile does not render Aurora's request for declaratory relief moot. Instead, it simply shows that Aurora is likely entitled to the declaration it seeks. Aurora retains a legitimate interest in obtaining an actual judgment declaring its non-liability, as opposed to the Court's interlocutory ruling on Aventine's motion to amend.

Aventine next argues that the Court should decline to exercise jurisdiction over Aurora's remaining claim for discretionary relief. The Federal Declaratory Judgment Act provides, in relevant part:

> In a case of actual controversy within its jurisdiction, except with respect to [certain enumerated actions], any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a) (emphasis supplied). As the language of the statute suggests, whether to grant declaratory relief is discretionary. *Medical Assur. Co., Inc. v. Hellman*, 610 F.3d 371, 379 (7th Cir. 2010); *Aetna Cas. and Sur. Co. v. Jefferson Trust and Sav. Bank of Peoria*, 993 F.2d 1364, 1366 (8th Cir. 1993).

In *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282–90 (1995), the Supreme Court held that federal district courts have broad discretion in determining whether to exercise jurisdiction in a declaratory judgment action when parallel proceedings are pending in state court. Suits are "parallel" if substantially the same parties litigate substantially the same issues in different forums. *Scottsdale Ins. Co. v. Detco Industries, Inc.*, 426 F.3d 994, 997 (8th Cir. 2005). "In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Wilton,* 515 U.S. at 288. But *Wilton* expressly limited its holding to cases in which there were parallel state proceedings. *Id.* at 290.

---

for [its] adversary, the presumptive plaintiff, to bring suit." *DeBartolo v. Healthsouth Corp.*, 569 F.3d 736, 741 (7th Cir. 2009).

When there is not a parallel state action pending, the Eighth Circuit has held that the broad discretion allowed under *Wilton* should be tempered by a six-factor test. *Scottsdale*, 426 F.3d at 998. Without a parallel state action, the interests of practicality and judicial administration are less pressing, and courts should not decline jurisdiction as readily. *Id.* at 999. And without a second, parallel case, it becomes less likely that all of the parties' claims will be satisfactorily adjudicated. *Id.*

The six *Scottsdale* factors are: (1) whether the declaratory judgment sought will serve a useful purpose in clarifying and settling the legal relations in issue; (2) whether the declaratory judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the federal proceeding; (3) the strength of the state's interest in having the issues raised in the federal declaratory judgment action decided in the state courts; (4) whether the issues raised in the federal action can more efficiently be resolved in the court in which the state action is pending; (5) whether permitting the federal action to go forward would result in unnecessary entanglement between the federal and state court systems, because of the presence of overlapping issues of fact or law; and (6) whether the declaratory judgment action is being used merely as a device for procedural fencing—that is, to provide another forum in a race for res judicata or to achieve a federal hearing in a case otherwise not removable. *Id.* at 998.

In *Scottsdale*, there was a second case pending in state court, it simply was not sufficiently similar to be considered parallel. *Id.* at 996–97. In the present dispute, there is no state proceeding whatsoever, parallel or otherwise. It is not entirely clear that *Scottsdale* applies in such circumstances. But several circuits have held that, even absent any state proceeding, district courts may exercise the intermediate level of discretion set forth in *Scottsdale*. *See, e.g.*, *Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 143–44 (3d Cir. 2014); *Sherwin–Williams Co. v. Holmes Cnty.*, 343 F. 3d 383, 394 (5th Cir. 2003); *United States v. City of Las Cruces*, 289 F.3d 1170, 1183 (10th Cir. 2002). The Court will therefore assume that *Scottsdale* applies even when there is no other case pending.[10]

The first and second *Scottsdale* factors weigh in favor of deciding this declaratory judgment action. A declaratory judgment will clarify and settle

---

[10] There is, of course, a parallel lawsuit pending before this Court: the Grain Lawsuit. The Court will nonetheless evaluate this request for declaratory relief as if there were no parallel proceeding. Aurora's claims under in the Grain Lawsuit also invoke the Declaratory Judgment Act. And Aventine has not asked the Court to decline to exercise its discretion to hear those claims. So, it hardly makes sense for the Court to decline to hear Aurora's request for declaratory relief in *this* case, on the grounds that Aurora could raise it in another case before this very Court.

- 16 -

the legal relations at issue in this case, and afford relief from the uncertainty, insecurity, and controversy of this portion of the parties' dispute. True, other disputes will remain between these parties. But this case presents a chance to begin narrowing the scope of that dispute. The third, fourth, and fifth *Scottsdale* factors are inapplicable. Finally, as to the sixth factor, there is no evidence that this lawsuit is being used as a device for procedural fencing. Having considered the *Scottsdale* factors, the Court finds it appropriate to exercise jurisdiction over Aurora's claim for declaratory relief.

In sum, the Court finds that Aurora's request for injunctive relief, and the corresponding request for declaratory relief, are moot, and will grant Aventine's motion to dismiss that portion of Aurora's complaint. The Court finds that Aurora's remaining request for declaratory relief is not moot, and further finds that it presents an appropriate invocation of the Court's jurisdiction under the Declaratory Judgment Act. To that extent, Aventine's motion will be denied.

C. EASEMENT LAWSUIT - AVENTINE'S MOTION TO CONSOLIDATE

Aventine also asks the Court to consolidate the Easement and Grain Lawsuits. Case no. 4:14-cv-3032, filing 20. Aurora is not opposed to this request. However, given the Court's findings in this Memorandum and Order, consolidation may no longer be the most productive course of action.

Consolidation is governed by Rule 42(a), which provides that if actions before the Court involve a common question of law or fact, the Court may: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay. Fed. R. Civ. P. 42(a). The Court has broad discretion in determining whether to consolidate cases. *Enterprise Bank v. Saettele*, 21 F.3d 233, 235 (8th Cir. 1994). Consolidation is permitted as a matter of convenience and economy in administration, but does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another. *Id.*

The Grain Supply and Easement Lawsuits are eligible for consolidation, in that they involve overlapping questions of law and fact. But as a result of the Court's findings in this Memorandum and Order, the cases may now be at very different procedural stages. The Grain Lawsuit is in its preliminary stages—little has happened there (aside from Aventine's motion for injunctive relief) and the case is (more or less) stayed pending arbitration. But in ruling on Aventine's motion to amend in that case, the Court has tipped its hand, so to speak, on its view of the merits of Aurora's request for declaratory relief in the Easement Lawsuit. So, unless there are undisclosed

issues of fact or new arguments to consider, the Easement Lawsuit may be amenable to disposition on summary judgment.

Therefore, it may not make sense to consolidate these cases at this time. The Court appreciates this cooperation by the parties and their effort to efficiently resolve a complicated set of disputes. Perhaps the Court has underestimated the need for discovery or further proceedings in the Easement Lawsuit. That case may not be as close to resolution as the Court suspects. Therefore, the parties should consult and determine the best course of action. If the parties still suggest that consolidation is appropriate, then they should notify the Court. Accordingly,

IT IS ORDERED:

1. Aventine's motion for leave to amend its answer and counterclaims (case no. 4:12-cv-3200, filing 49) is granted in part and denied in part, as set forth above.

2. Aventine's motion to dismiss (case no. 4:14-cv-3032, filing 20) is granted in part and denied in part, as set forth above.

3. Aventine's motion to consolidate (case no. 4:14-cv-3032, filing 20) is denied, but without prejudice.

Dated this 25th day of November, 2014.

BY THE COURT:

_____
John M. Gerrard
United States District Judge